IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GREGORY GOSSETT and
PHIL ATHERTON,

Plaintiffs,

v.

ROGER E. WALKER, JR.,
SALVADOR GODINEZ,
RICK BARD, and ROBERT
SHELTON FREY,

Defendants.                                                     No. 06-0600-DRH

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### I. Introduction and Background

This matter comes before the Court on Defendants' motion for summary judgment (Doc. 61). Naturally, Plaintiffs oppose the motion (Doc. 79). Based on the following, the Court **GRANTS** the motion for summary judgment.

On August 3, 2006, Gregory Gossett and Phil Atherton filed a two-count complaint against Rod R. Blagojevich, Roger E. Walker, Jr., Salvador Godinez, Rick Bard and Robert Shelton Frey (Doc. 2).[1] Count I alleges that Defendants violated 42 U.S.C. § 1983 by unlawfully using Plaintiffs' political affiliations, Republicans, as a motivating factor to try and discharge them. Count II alleges that Defendants'

---

[1] On December 21, 2007, the Court granted a stipulation of dismissal with prejudice as to Blagojevich (Doc. 55).

conduct was extreme and outrageous and, thus, constituted intentional infliction of emotional distress. On January 22, 2008, Defendants moved for summary judgment on Plaintiffs' complaint (Doc. 61). On March 3, 2008, Plaintiffs filed their opposition (Doc. 79) and Defendants filed their reply March 17, 2008 (Doc. 80). The motion is ripe for ruling and the Court turns to address the merits of the motion.

## II. Facts

Gossett and Atherton are employees of the Illinois Department of Corrections ("IDOC") at Tamms Correctional Facility ("Tamms"). Defendant Walker is the Director of the IDOC; Defendant Godinez is the Chief of Operations and the Chief of Staff for the IDOC; Defendant Bard is the Deputy Director of District 5 and the Chief of Labor Relations for the IDOC; and Defendant Frey is the Assistant Warden of Programs and Warden of Tamms. Both Gossett and Atherton are Republicans and voted as such in every election in this decade. The Complaint alleges that all Defendants are Democrats.[2]

In 2003, Gossett was a Unit Superintendent at Tamms. Gossett also served as the Duty Administrative Officer on a rotating basis. While performing as

---

[2]The Court notes that there is conflicting testimony as to both Godinez and Frey's political party affiliations. Godinez testified that he is not a Democrat. (Doc. 63; Exhibit P, p. 29). While Plaintiffs' Complaint alleges that he is a Democrat and Defendants' Answer admits that Godinez is a registered member of the Democratic Party (Doc. 12, ¶ 14). As to Frey, the Complaint alleges that he is a Democrat and Defendants' Answer admits "that in the last primary election in which he voted he took a Democratic ballot." (Doc. 12, ¶ 18). However, Defendants' memorandum in support states that "Frey and Godinez clearly share Plaintiffs' claimed affiliation. Plaintiffs cannot dispute that Defendant Frey was an assistant attorney general under Attorney General Jim Ryan, a Republican." (Doc. 62, p. 8). Further, in his deposition, Frey testified that was an Independent. (Doc. 79; Exhibit 2, p. 8). That said, the Court finds that these discrepancies are irrelevant to the issues at bar.

the Duty Administrative Officer, Gossett was in charge of Tamms and had the same authority and responsibilities as the Warden. However, while performing as the Duty Administrative Officer, Gossett did not have the policy-making authority of a warden or of an assistant warden. In 2003, Atherton was a carpenter at Tamms.

During the fall/winter of 2003, Atherton built a cabinet at Tamms for the property that Gossett was renting from Atherton. Gossett gave Atherton permission to build the cabinet as long as Atherton used his own materials and did so on his own time. Despite that caveat, Atherton built the cabinet during work hours using a state-owned saw and his own materials. On November 11, 2003, Gossett picked up the cabinet from Tamms and took it to the rental property. This incident was in direct violation of the IDOC's rules and policies. Prior to Gossett taking the cabinet out of Tamms, Darren Baggott, Atherton's supervisor, brought a personal camera into Tamms to take pictures of the cabinet. By bringing in the camera, Baggott also violated several department and institutional policies.

The IDOC initiated an investigation and placed both Gossett and Atherton on paid administrative leave pending the outcome of the investigation. On August 30, 2004, the IDOC completed its investigation. Based on the investigation, the IDOC found that both Gossett and Atherton committed Official Misconduct and Theft of Services and that Gossett, Atherton and Baggott violated the IDOC's rule regarding Conduct of Individual. (Doc. 63; Def. Exhibit E). On September 1, 2004, Gossett and Atherton were referred for employee review hearings for disciplinary action. (Doc. 63; Def. Exhibits F & G).

On September 13, 2004, the IDOC held Gossett and Atherton's Employee Review Board ("ERB") hearings. (Doc. 63; Def. Exhibits H & I). Hearing Officer Karla Klindworth conducted both hearings and recommended that both Gossett and Atherton be discharged. Defendant Frey concurred with Hearing Officer Klindworth's decision to discharge Gossett and Atherton. Thereafter, Defendants Bard, Godinez and Walker concurred with Defendant Frey's recommendation to terminate Plaintiffs.

Around October 16, 2004, both Gossett and Atherton were moved from paid administrative leave to unpaid suspension pending discharge. On November 14, 2004, the IDOC discharged Atherton and on November 15, 2004, the IDOC discharged Gossett. Both Gossett and Atherton appealed their terminations. On April 20, 2005, the Labor Relations Board reduced Atherton's termination to a 15-day suspension. On July 25, 2005, the Illinois Civil Service Commission reduced Gossett's discharge to a 90-day suspension. Thereafter, Gossett and Atherton were reinstated as active IDOC employees. As part of the Resolution Prior to Arbitration, Atherton agreed to take unpaid general leave from March 2, 2005 through April 20, 2005. Gossett was never paid for any time between his suspension and return to work.

Shortly after the incident regarding the cabinet and prior to Plaintiffs' suspension pending discharge, radio, television and newspapers repeatedly published information as to Plaintiffs' conduct surrounding the cabinet incident. According to Plaintiffs, this information could have only been provided by Defendants

or their agents.

### III. Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Fed. R. Civ. Proc. 56(c)**. A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. ***Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir. 1994)**. The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. **Fed. R. Civ. Proc. 56(e);** ***Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)**. In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. ***Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)**.

This standard should be applied "with added rigor" in employment discrimination cases, in which intent and credibility are crucial issues. ***Webb v. Clyde Choate Mental Health and Development Center*, 230 F.3d 991, 997 (7th Cir. 2000);** ***Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999);** ***King v. Preferred Technical Group, Inc.*, 166 F.3d 887, 890 (7th Cir. 1999)**. This

standard reflects pronouncements that in employment discrimination cases, which often involve issues of motive and intent, summary judgment must be approached with caution. ***Huhn v. Koering Co.*, 718 F.2d 239, 242 (7th Cir. 1983).** *Huhn* relied on an earlier case which recognized that, although summary judgment is improper in employment discrimination cases which involve "weighing of conflicting indications of motive and intent,"where a plaintiff has no evidence of discriminatory motive to "put on the scales for weighing," summary judgment *is* appropriate. ***Id.***

### IV. <u>Analysis</u>

**Eleventh Amendment Immunity**

First, Defendants maintain that Plaintiffs' claims are barred by Eleventh Amendment immunity because Plaintiffs have sued Defendants for actions taken as state officials and an official capacity suit against a state official is deemed to be a suit against the state. Plaintiffs respond that sovereign immunity does not bar actions against state officials in their individual capacities. Specifically, Plaintiffs respnd that "[s]ince the 11th Amendment is not in play, the only proper immunity issue for the Court to consider is whether Defendants are entitled to qualified immunity." (Doc. 70, p. 14).

The Eleventh Amendment recognizes that each state is a sovereign entity, and "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without consent." ***Hans v. Louisiana*, 134 U.S. 1, 13,(1890)**. By its express terms, the Eleventh Amendment bars federal court suits against a state

by citizens of any *other* state. **U.S. Const. Amend. XI**.³  The United States Supreme Court consistently has held that unconsenting states are immune from suits brought in federal court by their *own* citizens as well as by citizens of other states. ***Ameritech Corp. v. McCann,* 297 F.3d 582, 585 (7th Cir. 2002)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974))**.

The bar against federal court suits extends to state agencies and state officials as well states. ***See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *See also Ill. Assoc. of Mortgage Brokers v. Ofice of Banks and Real Estate,* 308 F.3d 762, 765 (7th Cir. 2002); *Ryan v. Ill. Dep't of Children and Family Services,* 185 F.3d 751, 758 (7th Cir.1999) (as agency of state, Illinois Department of Children & Family Services was entitled to Eleventh Amendment immunity against § 1983 claims)**.

There are narrow circumstances in which a suit can proceed against a state, its agencies, or officials.  For instance, a state can waive the protections of the Eleventh Amendment and consent to be sued in federal court. ***Ameritech,* 297 F.3d at 585**.  Additionally, the United States Congress can use its enforcement powers

---

³The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

under the Fourteenth Amendment to abrogate a state's Eleventh Amendment immunity. *Id.* Furthermore, a suit for prospective injunctive relief (though not money damages) may proceed against state officials in limited circumstances as outlined in **Ex Parte Young, 209 U.S. 124 (1908);** *see* **Ameritech, 297 F.3d at 585**. Finally, a suit for money damages may proceed against a state official sued in his individual capacity (as opposed to his official capacity) for wrongful conduct attributable to the official himself, "so long as the relief is sought, not from the state treasury but from the officer personally." **Alden v. Maine, 527 U.S. 706, 757 (1999)**.

Here, Plaintiffs' complaint *expressly* states that they are suing Defendants "each in their official and individual capacities" (Doc. 2, p. 1). Thus, based on the case law, Plaintiffs' claims against Defendants in their official capacity are barred by Eleventh Amendment immunity and Defendants are entitled to summary judgment on the same.

**Count I**

To state a claim for First Amendment retaliation, a plaintiff "must present evidence that: (1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's action." **George v. Walker, 535 F.3d 535, 538 (7th Cir. 2008)(citing Masey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006); Mullin v. Gettinger, 450 F.3d 280, 284 (7th Cir. 2006); Spiegla v. Hull, 371**

**F.3d 928, 942 (7th Cir. 2004))**.

Generally, "public employees may not be made to suffer adverse job actions because of their political beliefs." **Carlson v. Gorecki, 374 F.3d 461, 464 (7th Cir. 2004) (citing Rutan v. Republican Party of Illinois, 497 U.S. 62, 79 (1990); Elrod v. Burns, 427 U.S. 347 (1976))**. It is therefore "well established that hiring, firing, or transferring government employees based on political motivation violates the First Amendment," with certain exceptions for employees in policymaking or confidential positions. **Hall v. Babb, 389 F.3d 758, 762 (7th Cir. 2004)**. The Supreme Court recognizes that "party affiliation may be an acceptable requirement for some types of government employment." **Branti v. Finkel, 445 U.S. 507, 517 (1980)**. For example, political affiliation is appropriate where "the *position* held by the individual authorizes, either directly or indirectly, meaningful input into government decision making on issues where there is room for principled disagreement on goals of their implementation." **Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th Cir. 1985)(quotation omitted)**. The Seventh Circuit condones the use of official position descriptions as determinative of the "policymaking" nature of the job, assuming the descriptions are reliable and authentic." **Riley v. Blagojevich, 425 F.3d 357, 361 (7th Cir. 2005)**.

Here, there is no contention that either Gossett or Atherton is a policymaker or is in a confidential position. Thus, the Court may move on to whether the prima facie case has been satisfied.

To establish the necessary causal link, Plaintiffs must show that their party affiliations were "a substantial or motivating factor" in the decision. ***Massey*, 457 F.3d at 717**. "A motiving factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." ***Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)**. The Seventh Circuit has noted that "[t]hat burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." ***Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981), cert. denied, 455 U.S. 1021 (1982)**. Circumstantial proof of discriminatory animus such as timing and the disparate treatment of similarly situated employees can suffice: Plaintiffs are not required to come forward with "the so-called smoking gun." ***Massey*, 457 F.3d at 716**. If Plaintiffs make out their prima facie case, the burden shifts to Defendants to show that Plaintiffs would not have been terminated regardless of their political affiliations. ***Id.* at 717**, if Defendants meet this burden, the burden shifts back to Plaintiffs to show that Defendants reasons were pretextual and that the discriminatory animus was the real reason they were terminated. *Id*.

A threshold consideration in ***Rutan*** cases is whether the Defendants knew of the Plaintiffs' political affiliations. ***Hall*, 389 F.3d at 762; *Nelms v. Modisett*, 153 F.3d 815, 819 (7th Cir. 1998)**. If they were not, Plaintiffs cannot survive summary judgment.

Defendants contend that they are entitled to summary judgment because Plaintiffs have no evidence that any Defendant knew that they were Republicans. Defendants maintain that Gossett testified that he was not aware that Defendants even knew of his political volunteering and contributions to various Republicans and that Gossett testified that he never discussed his voting record or political views with Defendants. Defendants also maintain that Atherton testified that he made political contributions, but that none of the Defendants were aware of such activity and that none of the Defendants were aware of his volunteering activities for political campaigns. Defendants contend that Atherton testified that Defendants were unaware of his politics, unaware of his voting record and that he had not discussed his politics with Defendants.

In response, Plaintiffs maintain that while neither specifically remembered telling any of the Defendants about their party affiliation, that is not controlling. They maintain that Defendants did know that they were Republicans. In support of this, Plaintiffs rely on an affidavit submitted by Samuel Riley, the Duty Warden at Tamms. Riley's affidavit states that '[i]t was widely known that Atherton and Gossett were Republicans" and that "the work environment, in 2003 and 2004, … was very politically charged." (Doc. 79; Exhibit 1). Further, Plaintiffs rely on Gossett's wife's affidavit to establish Defendants' knowledge. Bobbie Lee Gossett's affidavit states that she had a conversation with Defendant Bard before Plaintiffs were put on administrative leave in which Bard stated "Greg was one of the good guys even if he was not the same party as them." (Doc. 79; Exhibit 6). Viewing the

evidence (albeit slim) in the light most favorable to Plaintiffs, which the Court must do, the Court will assume that Defendants had knowledge of Plaintiffs' political affiliations. That Defendants knew of Plaintiffs' political affiliations is not, of course, sufficient to show causation. Plaintiffs must show that Plaintiffs' affiliations were a substantial or motivating factor in Defendants' decision to terminate them for the cabinet incident. Defendants contend that Plaintiffs cannot meet this burden. The Court agrees with Defendants. Plaintiffs have failed to point to any evidence in the record that, even if their political associations or activities had been known, those factors motivated in any way Defendants' decisions to terminate. Plaintiffs admit that their 2003 conduct was wrongful, in violation of IDOC policy and directives and warranted discipline.

Plaintiffs argue that the record is full of suspicious behavior from which a reasonable jury can conclude politics motivated Defendants' decision to terminate Plaintiffs. Plaintiffs point to several pieces of circumstantial evidence. First, Plaintiffs point to Defendant Frey's conversations with current and former IDOC administrators, in particular conversations with Defendant Godinez, George Welborn, former Warden at Tamms and Brad Housewright, Atherton's supervisor. As to Godinez, Plaintiffs argue that Frey did not deny that he had a conversation with Godinez, instead he said that he does not recall having the conversation.[4] As to

---

[4] Q. Do you recall Mr. Godinez ever asking you if Gossett and Atherton were, and I quote, "our guys"?
MS. PETRY: Object, it calls for hearsay.
The WITNESS: I don't recall ever having a conversation with Mr. Godinez about this series of events.

Welborn, Plaintiffs contend that Frey admitted that he spoke to Welborn about the situation and that Frey did not deny being pressured from his superiors, instead that Frey said that he did not recall stating he was being pressured.[5] Plaintiffs further assert that Welborn's affidavit indicates that Frey spoke to Godinez before the ERB hearings and that Frey thought that the punishment was too severe. (Doc. 79; Exhibit 8). Further, Plaintiffs state that Housewright's affidavit reveals the that Frey was under pressure from his superiors to terminate Plaintiffs even though he believed that punishment was too severe. (Doc. 79; Exhibit 9). Plaintiffs argue that based on the above they have presented evidence which brings Defendants credibility and motivation for attempting to discharge Plaintiffs into dispute. The Court does not agree. This evidence does not establish or put into dispute that political affiliation was a motivation for the decision to terminate Plaintiffs. The evidence reveals that Frey cannot recall the specifics of certain conversations that he had regarding the incident and that he felt bad about having to discipline employees that he considered friends. Pressure from a supervisor does not equate to pressure to terminate for political reasons. Furthermore, this is speculation on Plaintiffs' part.

---

(Doc. 79; Exhibit 7, p. 44).

[5] Q. And did you ever say anything to Welborn about getting pressure from your superiors about how to handle – about handling the situation?
A. Not that I recall, no.
Q. Other than just being upset about the possibility of having to discipline friends, do you recall anything else about the conversation that you had with Welborn?
A. Prior to the hearing?
Q. Prior to the hearing.
A. Nothing specific, no.
(Doc. 79; Exhibit 2, p. 60).

Next, Plaintiff contends that there should have been a "reportable incident report" and emails regarding this incident. Plaintiff contends that these documents are critical. However, Plaintiffs do not state why these documents are necessary to show Defendants' motivation or how they would show Defendants' motivation to terminate them. This theory is nothing more than speculation.

Further, Plaintiffs contend that the outcomes of the ERB hearings were predetermined, thus, a jury could find that the decision was politically motivated. In support, Plaintiffs argue that Defendant Frey admitted that he might have discussed the outcome with Housewright before Klindworth issued her decision on September 13, 2004. Plaintiffs also maintain that Housewright's affidavit establishes that this conversation took place. Further, Plaintiffs also contend that Gossett told Klindworth this would happen before she made her decision. Defendants contend that Housewright's affidavit undermine's Plaintiffs' contention that the Defendants' termination recommendations were predetermined in that Housewright's affidavit reveals that the alleged conversation with Frey took place after the September 13, 2004 ERB hearings.[6] This does not put forth evidence of Defendants' decision to

---

[6]Housewright's affidavit states: "1. The affiant, participated in a meeting with Warden Shelton Frey, sometime in November 2004 and prior to an Illinois Department of Corrections Employee Review Board involving Phillip L. Atherton and Greg Gossett and makes the following statement:
"I was Chief Engineer at Tamms Correctional Center and was a supervisor of Philip L. Atherton. Darren Baggot was the Assistant Chief Engineer. Philip L. Atherton told me that he had heard that he and Greg Gossett were going to be terminated for their alleged infractions and that Darren Baggott was going to receive 5 days off for his act of bringing a camera to the institution. As supervisor of Philip L. Atherton and Darren Baggot, I wanted to know if this was true. Therefore, I scheduled an appointment with Warden Shelton Frey to make an inquiry. Warden Frey confirmed that it was true that Atherton and Gossett were to be fired and Baggot was to receive 5 days off. It is my recollection that Warden Frey stated this disciplinary decision and instruction was coming

terminate Plaintiffs was based on political motivation. Moreover, this evidence again is mere speculation.

Lastly, Plaintiffs contend that they were treated different than other employees who violated the same policies/rules as them. Specifically, Plaintiffs contend that a Senior Public Service Administrator, employed at the Jackson County, Illinois IDOC, was found guilty of violating the same departmental rules as Plaintiffs plus several other more serious rules. Plaintiffs maintain that this employee, a more senior employee and whose misconduct was more serious, only received a 15 day working suspension after taking a pool table donated to Jackson County IDOC to the employee's home. As to this argument, the Court finds this incident is this irrelevant because of the obvious factual differences between the two incidents. Further, Plaintiffs have not shown that these employees were similarly situated and that the incidents were similar.

Plaintiffs have not set forth sufficient evidence to establish a prima facie case. Plaintiffs failed to point to any evidence in the record that their political affiliations motivated in any way Defendants' decision to terminate them. While the circumstances of this case are sufficient "to raise some eyebrows," they are not sufficient to raise a jury question. ***Tarpley v. Jeffers*, 96 F.3d 921, 930 (7th Cir.**

---

from the office of Salvadore Godinez. It was my impression, from Warden Frey, that he was under pressure from his superiors to terminate Gossett and Atherton, even though he believed that the punishment to be too severe. This meeting took place prior to the Employee Review Board Hearings for Atherton and Gossett.'" (Doc. 79; Exhibit 11). Further, the Court notes that the dates contained in Housewright's affidavits are wrong. The Employee Review Board hearings were held September 13, 2004.

**1996)**. As the Court of Appeals noted held in **Simmons v. Chicago Bd. of Educ., 289 F.3d 488, 495 (7th Cir. 2002)**, "In cases where plaintiffs have prevailed on political motivation claims, they have offered far more evidence than this, such as a pattern of decisions based on political factors, or direct testimony from someone other than the plaintiff that the defendant wanted to rid the division of a political opponent." Plaintiffs have not shown a pattern of political discrimination or produced direct testimony that the decisionmaker was looking to get rid of political opponents. While the Plaintiffs contend that the evidence in this matter presents a circumstantial case sufficient to allow a jury to conclude that they could prevail at trial, and a dispute of material fact sufficient to survive a summary judgment motion; the evidence, in reality, rises to nothing more than rank speculation, and, as such, cannot, as a matter of law, reach a jury, support a jury verdict or a judgment for the Plaintiffs. Because it is clear that Plaintiffs cannot establish a prima facie case, the Court need not address the question of whether the Defendants can meet their burden of showing that Defendants would not have discharged them even absent their political affiliations.

### Qualified Immunity

Next, Defendants argue that they are entitled to qualified immunity as Defendants' actions were not outside their official duties and were acted upon pursuant to standard IDOC operations and protocol. Plaintiffs merely respond that Defendants' actions were not reasonable. The Court finds that this debate is moot.

The Seventh Circuit has held: "Because we find that there was no constitutional violation, it is unnecessary to consider whether the defendants are entitled to qualified immunity." ***Kraushaar v. Flanigan*, 45 F.3d 1040, 1049 FN4 (7th Cir. 1995)(citing *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1328 (7th Cir. 1993)); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997)**. Based on the analysis above, the Court concludes that there was no constitutional violation as there is no evidence that Defendants were acting outside the scope of their official capacities and that it is unnecessary to address the whether Defendants are entitled to qualified immunity.

**Count II**

In Count II, Plaintiffs allege a state tort claim for intentional infliction of emotional distress ("IIED"). Under the law of Illinois, to prevail on a claim of IIED, a plaintiff must demonstrate that (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant intended that his conduct inflict severe emotional distress, or knew or should have known that there was a high probability that his conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. ***McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (Ill. 1988).** For a plaintiff to recover, he must show that a "recitation of the facts to an average member of the community would arouse resentment against the actor and lead him to exclaim: 'Outrageous!' " ***Doe v. Calumet City*, 161 Ill. 2d 374, 392 (Ill. 1994).** The tort does not cover "mere

insults, indignities, threats, annoyances, petty oppressions, or other trivialities." ***McGrath*, 126 Ill. 2d at 86., quoting *Restatement (Second) of Torts* § 46, comment d, at 73 (1965).** In determining whether certain conduct is sufficiently outrageous to support an IIED claim, the Illinois Supreme Court has directed that one factor courts should consider is the level of power or authority that the defendant has over the plaintiff. ***Id*. at 86-87.**

Gossett and Atherton maintain that Defendants are responsible for a "significant media blitz" arising of the cabinet incident and that Defendants' conduct arises to intentional infliction of emotional distress. Plaintiffs argue that the media began reporting their misconduct as early as December 9, 2003 and that the media could only have gotten this information from Defendants. As to these claims, the Court concludes that Plaintiffs cannot and have not demonstrated extreme and outrageous conduct. First, Plaintiffs have not produced or pointed to any evidence that these named Defendants supplied information to the media. Second, assuming *arguendo* that the Defendants did supply information to the media, the Court finds that conduct was not so extreme or outrageous to support a claim of IIED. It does not scream "outrageous!"

Further, the Court notes that in their response to summary judgment, Plaintiffs assert claims for denial of due process (Doc. 79, ps. 13-14). However, Plaintiffs' complaint does not state such claims and Plaintiffs have not moved to amend their complaint to add such claims. Clearly, it is improper for Plaintiffs to

assert such claims at this juncture in the litigation. Therefore, the Court need not address these assertions.

## V. Conclusion

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment (Doc. 61). The Court **ORDERS** the Clerk of the Court to enter judgment in favor of Roger E. Walker, Jr., Salvador Godinez, Rick Bard and Robert Shelton Frey and against Gregory Gossett and Phil Atherton.

**IT IS SO ORDERED.**

Signed this 10th day of September, 2008.

/s/       *David R Herndon*

 **Chief Judge
United States District Court**